Good morning, Your Honors. May it please the Court, Elizabeth Richardson Royer for Appellant Stephen Bennett. I'd like to reserve three minutes for rebuttal, please. Mr. Bennett is serving a life sentence with no possibility of parole for having merely aided and abetted a robbery that went fatally wrong outside of his presence. In California, sentences of death and life without possibility of parole cannot be imposed for felony murder, absent proof beyond a reasonable doubt that the defendant acted with a reckless disregard for the value of human life. What would the sentence have been if all they did was get a conviction for a felony murder? The sentence would have been 25 years to life with possibility of parole. And that is what he would be resentenced to if this Court grants relief. But at the moment, he's basically there for the rest of his life without any possibility. Got it. That's correct. And the standard, this reckless indifference standard is a high standard and it's meant to be a high standard. It's reserved for the most culpable defendants. At Mr. Bennett's trial, the evidence was simply insufficient to support a finding that by aiding and abetting a robbery, he was subjectively aware of a grave risk of death. This morning, I'd like to touch briefly upon the reasons that 28 U.S.C. § 2254d does not bar relief in this was unreasonable, both under § 2254d-2 and under § 2254d-1. I think the most obvious error was under § 2254d-2 because the State Court made several clearly unreasonable determinations of fact in denying Mr. Bennett relief. The first is that the State Court found that Mr. Bennett heard Reuben Avery say prior to the crime that $1,200 was not worth anyone's life. But the record leaves no question that Avery said this to law enforcement and well after the crime occurred, Mr. Bennett overheard no such thing. The second unreasonable determination of fact that the State Court made was that Brandon Turner's comment that he needed to do a lick because he had nowhere to stay and no money meant that violence was likely to occur. And as the record once again makes clear, doing a lick is simply synonymous with performing a robbery. But counsel, there are different types of robberies. Robbing the old lady walking down the street is one thing. Robbing a drug dealer is something else. Is there anything that the jury could have inferred from the fact that this was the robbery of a drug dealer which would aid the government's case towards reckless indifference? Your Honor, the answer to that is no, at least not under the current case law, not under TSON, which is what the California legislature based Penal Code § 190.2d on, and not under the California cases interpreting what reckless indifference to human life means. The mere robbery of anyone at any time of day is simply not enough under this standard. And if this Court were to hold on the facts of this case that the standard was satisfied, it would not only represent an extension of California law interpreting the Penal Code section, but also an expansion of the class of cases for which the death penalty could be imposed under the Eighth Amendment and under TSON. But if people were going to rob, let's say, an armored car, where you know the people inside are armed, and that, as far as you're concerned, as you're reading in California law, that wouldn't matter. That would not be part of the calculus. That's correct, Your Honor. There has to be something more. If you look at the cases that have found this standard satisfied, there is substantial indication that violence is likely to occur. If you look at TSON, two brothers went to break their father out of a camp. They brought a chest full of guns. They watched him kill the victims, and they helped him escape afterwards. Although in TSON, the killing takes place after the prison break. And it's after they get this car, and then, I mean, so, I understand TSON is actually helpful to you, but it's not because there was a killing during the actual prison break. It was the killing after they had escaped. Yes, Your Honor. The killing occurred after the escape, but the two Petitioners in that case broke their father, a convicted murderer, and his friend, also a convicted murderer, armed them, and then watched them brutally kill an entire family before helping them escape. There is nothing in this case that comes close to those facts. There is no evidence that Mr. Bennett heard any discussion of a gun. There is no evidence that he saw a gun, that he had any reason to believe that a gun was involved. Well, you see, if he had any reason to believe that a gun was involved. I'll follow up on Judge Owen's questions. I mean, now we've got four guys going to rob a drug dealer of drugs worth about $1,200. And you don't walk up to him, the drug dealer, and say, give me your, give me the half ounce worth $1,200. You anticipate that the drug dealer will be at least somewhat wary. And it strikes to me at least reasonable to believe that it's likely that someone performing such a robbery will be armed. Why is that not something that should be considered here? Your Honor, I think the answer that I gave to Judge Owen's question, I think, is applicable here as well, is that the robbery of a drug dealer on the current case law is not enough. However, I think we also have to... No, but my question is a little more, has a little finer point within that. Why is it not permissible for the jury to conclude that your client reasonably anticipated that the robbers carried guns in order to accomplish the robbery? So the question is, what level of knowledge or reasonable suspicion did he have that they had guns? And I'm saying, well, why isn't it reasonable for the jury to conclude, you know, he probably knew they had guns because of the robbery they were about to undertake? Your Honor, I think that you're talking about an inference based on the circumstances of crime. Yes, exactly. Right. And under Tison and under Jackson, under Jackson what's required is that there be evidence beyond a reasonable doubt that a rational fact finder could use to support a special circumstance. And frankly, an inference of the kind that you're talking about tied to no evidence other than a robbery of the type that is normally not sufficient to satisfy the standard is not enough under Jackson. It simply is not the type of evidence that's sufficient, and I think the case of Juan H. is instructive on this point. There, again, there was some evidence that could, that the state court found supported an inference that the defendant there acted with a culpability that supported his conviction. And this court found that the inferences that the state court found sufficient were bare conjecture. They were speculation that was not sufficient to satisfy Jackson. And that's the case here as well, that that kind of inference is simply not sufficient. Well, we know he had to have heard the gunshots as they were killing Gray, right? Your Honor, no, I don't think there, I think there are sort of two responses to that argument. One is that there is no evidence that he heard the gunshots. No, but he, there, he was next to the building, the apartment building where everybody else heard the gunshots and he was in the street. So I think it's reasonable to draw the inference that he heard the gunshots. I'd like to address that inference, but first I just would like to point out that there is strong evidence that he did not hear the gunshots. As he drove away from the crime scene, he believed that Brian Gray was following him, angry about having been robbed. He was like, come with us, we got the drugs. This is not evidence that he knew that a, that a, that a gun crime had occurred or that Brian Gray had been shot. But even if the jury could have inferred that he heard the gunshots, that's still not enough under this reckless indifference to human life standard. And there are cases finding that that's not enough. There's an unpublished California case that's instructive as to how the California courts deal with this. It's a Lynch case that I cited in the briefing where the court said that when the defendant in that case helped someone escape after the robbery of a jewelry store, that even if he knew that the victim in that case had been shot, that wouldn't have been enough to satisfy the reckless indifference standard. I also cited a case out of the Supreme Court of Florida where the defendant in that case went into the store with the person who fired the shots, was there when, when the victim was shot, helped the escape. And there the Florida Supreme Court held that that was not sufficient to satisfy the standard under Was there any argument by the prosecution in this case that the fact that your client was not at the shooting indicated knowledge, he knew exactly what was going to happen and that's why he conveniently was away during the shooting. Was that ever presented to the jury? I don't, I don't recall the prosecutor making that exact argument in closing argument. And I don't want to say for sure. I just don't remember that argument having been made. I think that there is evidence in the record to dispute that interpretation of the facts. Reuben Avery described a conversation that he had with Stephen Bennett several days after the crime occurred. After Mr. Bennett had learned that Brian Gray was shot, Mr. Bennett was crying. He said, this was never supposed to happen. They were only supposed to take the drugs. I think that's strong evidence that he did not expect for the, for a crime of this nature to occur. And it's that there simply is not enough evidence here to satisfy the standard. What do you do with the conversation in the police car? Your Honor, the conversation in the police car is the one piece of evidence that the district court found supported the state court's determination on the special circumstance. And there simply isn't enough there, once again. Mr. Bennett and Mr. Smith are talking in the car. They're describing stories that they told to law enforcement. There are many reasons that they might have wanted to get their stories straight after the fact. There is no reason to believe that Mr. Bennett did not know by that point, by the time he was interviewed by law enforcement, that guns were used and that he was lying to police and that he and Smith were talking about that. But nothing that happened after the fact can be sufficient to support the special circumstance finding about Mr. Bennett's state of mind before the crime occurred. Well, counsel, that, that, that can't be true. I mean, if, if after a murder occurs, someone helps hide the weapon or destroys evidence, they may be an accessory, but that also can be evidence that they knew what was going on ahead of time. So it can't be that there's a black line that says anything that happens after the murder, the jury can't consider to determine the defendant's process before the trigger is pulled. Black line aside, I'll concede that there may be some circumstances in which after the fact conduct could be instructive. But in this case, it simply was not. A conversation about what they told police after the fact, what Mr. Bennett knew after the fact, is not enough to satisfy Jackson. And I think it's important to remember what Jackson did. Jackson said that Thompson, which had previously held that in order to establish an insufficiency of the evidence claim, a petitioner was required to show that there was no evidence to support his conviction. And the Supreme Court in Jackson said, we are departing from that standard. We are not going to require a showing that there is no evidence. We are only going to require that no rational juror could have found something beyond a reasonable doubt. And so I think that even if the conversation in the police car could, out of stretch, be considered some evidence of knowledge, it's simply insufficient under the standard of this case, under the beyond a reasonable doubt standard to support the jury's special circumstance finding. And I see that I have three and a half minutes left, which I'd like to thank you. Thank you, counsel. Good morning, Your Honors. May it please the Court, Jennifer Truong, Deputy Attorney General, on behalf of Appellee Respondent Ron Barnes. The District Court properly denied relief in this case because the Court of Appeal reasonably concluded that sufficient evidence supported the robbery murder special circumstance. As Justice Owens pointed out, there are different types of robberies. This is not a simple purse snatching. It's not taking candy out of a bag with a crack cocaine in the middle of the night. Bennett was instrumental to this robbery. He set up the whole robbery. He lured Gray to bring $1,200 worth of crack cocaine. I think there's no doubt that he satisfies major participant. It's the other prong, the awareness of the grave risk to human life. So the Court of Appeal's decision, they write, here there was evidence that Bennett knew and emphasized italics before he drove his fellow addicts to Irvine, that at least one of them was planning violence. So would you just summarize what that evidence was? Yes, Your Honor. That evidence included he knew Smith and Turner were desperate for money and drugs. They were planning to rob a drug dealer. Bennett led PC to believe that he was going to buy the drugs. And then they send in Turner and Smith. Under those circumstances, he had to have anticipated that there was going to be a violent confrontation. How did he expect Smith and Turner to get drugs from PC? Just simply ask for it? He had to have anticipated that one of them was carrying a gun or there was going to be a violent confrontation. Also, as to the Court of Appeal's factual finding that Avery commented to Bennett before he left, $1,200 worth of dope isn't worth anyone's life. There is evidence in the record that supports that finding. In supplemental, in S.E.R. 493. Talk slowly. I want to follow you. Where am I supposed to look? S.E.R. 493. S.E.R.? What is that? I'm sorry. That's the supplemental excerpt of the record from Respondent. But provide some more context of what that is. I'm sorry, yes. The prosecutor is questioning Avery about the conversation he had with Bennett before they left. Things he said to Bennett, things Bennett said to him. And on line 17, the prosecutor asks, do you remember telling the police that you told him, referring to Bennett, and defense counsel objects, prosecutor continues, that you told him $1,200 worth of dope is not worth somebody's life, especially somebody with a kid. Do you remember saying that? I told that to the investigators. So from this record, the court of appeals... Wait a minute. Read that again. I don't have the S.E.R. I'll use the excerpt. I don't have the S.E.R. So read the question again. The prosecutor asks Avery, do you remember telling the police that you told him, that you told Bennett, referring to Bennett, that you told him $1,200 worth of dope is not worth somebody's life, especially somebody with a kid. Do you remember saying that? Telling the police that he said that to Bennett. I told that to the investigator. I told that to the investigator. Yes. Do you remember? But the question was, do you remember telling Bennett? Do you remember telling the investigator that you told Bennett this? And he says, I told that to the investigator. But was Bennett there when the police were there after the crime when he said, when Avery said, $1,200 worth of drug is not worth life? Was Bennett there at that time? Was Bennett there when Avery was being questioned by police? A couple of weeks after the crime. Yes. Avery says this and the police are present. Was Bennett also present at that time? I believe he was. Yes. Present, I'm sorry, present during your honor. We know that Avery, at least I'm taking it that we know, that Avery said to the police, or at least in a room when the police were present, after the crime, maybe about two weeks after. Yes. $1,200 not worth a life. Was Bennett there at that time when Avery said that? No, Avery made that statement to investigators outside of Bennett's presence. So counsel, just so I can make sure I understand here, Avery in speaking to the investigators post-arrest in an interrogation, according to the investigators, said this line about the lick, or the line about it would be really sad to see someone get killed because of the baby. Yes. And that when Avery's on the witness stand, Avery's not entirely consistent as to what he's saying. Right. So on redirect, he's then, in a sense, impeached with his own prior statement to the investigator. But the process question is, did you tell the investigators that the statement you're reading to was made in an interrogation between the detectives and Avery? Correct? The statement you just read. Yes. Well, Avery did make that statement to the investigators. When he was being interrogated by the detectives. Yes. And it was introduced at trial because Avery, on the witness stand, wasn't exactly consistent as to what he recalled saying. So they were trying to say, well, didn't you tell the investigators that you said this in front of Bennett? Isn't that right, sir? Okay. And then he says, yes, I told the investigator I made that statement to Bennett. Before they set off to rob Gray? Yes. If we, the prosecutor, the question from the prosecutor is, do you remember telling the police that you told Bennett this? And he's, and then when he reads the statement. When? Before they left. They're having a con, they're talking about the conversations that they had before Bennett left. So there is. So read me the part of that, that, that exchange that tells me that Avery is saying, I told Bennett before rather than after. So earlier on above on that page, they're talking about, do you remember telling the police that you told him, Hey, you guys don't have any money. I don't have anything to do with it. I'm not going to Irvine. And then he, he denies that statement. Do you remember telling Bennett when he asked you if you wanted to come with them to Irvine to get drugs with PC? So they're, they're talking about things that happened before they left. Then the prosecutor asked, do you remember telling the police that you told him you told Bennett $1,200 with a dope is not worth someone's life. I see. So it's a, you're saying it's a reasonable inference that there was that, that all of that questioning refers to before they departed to do the robbery. Yes, Your Honor. It's reasonable for the court of appeals to conclude based off this record that Avery made this statement to Bennett before he left, but that's not the only thing the court of appeal relied on. And in fact, the court of appeal made that finding in another evidence issue. Other evidence that suggested Bennett had to have known there'd be a violent confrontation included just the circumstances of the robbery. Counselor, I think for me, what is important is that recorded call in the police car. Yes, that's right. Now I've read it a couple of times and I think Judge Agbrams was correct to say it's equivocal. Um, what part of that recorded conversation would you point to us to say, you know, aha, here it is. This shows that he clearly knew beforehand there was going to be a gun involved and this was all going to go down. Can you point us to what page that would be of that recorded call? I don't have the page in front of me, but the laughter in that call. 285, 285. I'm sorry, I don't have that excerpt with me, but there's bracket. You're supposed, you're the one who's supposed to have the excerpt and be telling Judge Owens where this significant conversation is, not me. I can, I can grab it from my feedback. Yeah, because he's asking you about that. Yeah, but better, better if you, do you have it right here? It's just back at my seat back there. I know there's bracketed laughter on that page. Okay, there is, but why don't you. Why don't you grab it? Grab it. Okay. I'm sorry, I actually didn't bring that volume with me, but if you, if you have it before you, you can see that there's bracketed laughter. You know, why don't I give you this? Why don't you approach, and you can then read along. There you go. So I'm on page 285. On page 285, in the middle of the page, Bennett says, I'm sorry, before that, Smith says, yeah, he's talking about just another gun. I said, what are you talking about? I don't know. Bennett says, that's what I told him. They kept saying, I said, not that I know of. And shit, if he did, he wouldn't be in my car. You know what I'm saying? And then Bennett laughs. That laughter, and. Now, does it say Bennett laughs, or does it just say laughter? It says Bennett, brackets, laughter. Okay. That laughter, the jury heard that. We, we, we can't hear that. We see it in the record, but the jury heard that laughter. And the jury considered that with the statements that were made and the other lies they shared before making this statement. And in that context, we, it's, it's reasonable to conclude that Bennett was sharing lies with Smith, including the lie that he didn't know anyone had a gun. This was an implied admission. That they were getting their story straight. They were getting their story straight. So your counsel, to kind of go back to Judge Wardlaw's question, we've got the nature of the robbery you would say is more indicative than other types of robbery that this would be violence. You've got the Avery and Avery on the witness stand as this happens in trials is all over the place. And then the prosecutor tries to pin him down with a statement. He supposedly made the investigator. We have this exchange, the laughter. Is there anything else besides that? Because we really want to, I think I want to focus on, okay, what is it exactly here? Is there anything else besides those three things? Yes, after two days after the robbery, Bennett and Avery have a one-on-one and Bennett tells Avery they were supposed to take the dope, not shoot. He doesn't say they weren't supposed to have guns. He says they were not supposed to shoot. And the jury can reasonably conclude from that that he expected them to have guns and didn't expect them to shoot the guns. And that came out through the testimony of Avery? That was a recorded conference. I'm sorry. Yes, Avery testified to that. So that's, I mean, it's one thing to tell it to an investigator. It's another thing for that to actually be introduced at trial. Was that actually introduced at trial, that exchange? Yes. And also Bennett argues that there's no case that says a robbery like this is enough. But in Teeson, the U.S. Supreme Court held that a defendant acts with reckless indifference to human life if he engages in criminal activity known to carry a grave risk to human life. That's robbing a drug dealer of $1,200 worth of crack cocaine. And Bennett doesn't do it. He sends in two people that PC's not expecting to see. That's participating in criminal activity known to carry a grave risk to human life. Also, in that case, the U.S. Supreme Court also held that the greater the defendant's participation, the more likely it is that he acted with reckless indifference to human life. He set up this robbery. Yeah, but that's not, I mean, we'll give you that. That is to say, major participation, I don't think there's any question about that. Right. But just the more involved he is, the more he had to have known about, he had to have the subjective awareness of grave risk to human life. Also, as to Lynch, in Lynch, one, it was an act of, a spontaneous act by one person. That person was not supposed to have a role in the robbery, and they ended up pulling out a gun and shooting, firing a victim at the scene. So that's distinguishable from this case here, where it was a planned robbery. They understood that Smith and Turner were going to go in and rob PC of the drugs. So the facts there are not analogous to this case. Unless this court has any questions, I'm prepared to submit. No. Okay. Thank you. Thank you, counsel. And bring that ER the next time. I will. Just give me back mine. Yeah, even more important. Thank you. Give me back the right one, and I'll. I have just three brief points that I'd like to make in rebuttal. The first has to do with Ruben Avery's testimony, which my adversary pointed out on page. I'm sorry. Excerpt page 309. And I think if you look at what Ruben Avery says before the jury, he's asked, did you tell Mr. Bennett that $1,200 of dope was not worth anyone's life? And Avery's response is, I told that to the investigator. And if you look at his testimony, I'm sorry. If you look at the exhibit that was introduced at trial as well, and it was exhibit ADA, which is an excerpt of record page 243, which actually has the recording of the interview to which Avery is referring in his testimony, Avery does not say anything about having said this statement to Stephen Bennett. He says, $1,200 worth of dope is not worth anyone's life. And he tells that to the investigator. And his testimony is consistent with this point. He says, I told that to the investigator. So that's the first point. The second point, briefly, at ER page 285, where the conversation between Smith and Bennett in the police car occurs, counsel mentioned this bracketed laughter and mentioned that the jury actually heard this laughter. And the recording is not before the court. And I understand that. I do just want to say that having listened to the recording myself, it's not at all clear who's laughing. And in any event, as I mentioned before, there are many reasons that Mr. Bennett may have wanted Mr. Smith to believe that he was on his side. There are many reasons for them to get their story straight. And this just isn't enough. And finally, with respect to Mr. Bennett's statement that Brian Gray was not supposed to get shot, that he says days later when he's crying to Reuben Avery after having discovered that Brian Gray was murdered, the fact that he says they were not supposed to shoot Brian Gray is evidence, if anything, that the crime was unexpected and that he did not expect this to occur. And he was not subjectively aware of the risk of this occurring. And I think the final point that I want to make in my remaining time is that because of the way the California legislature dealt with Penal Code Section 190.2d by lumping the death penalty and life without possibility of parole sentences together, I think it really helps to think about what would happen if this had been charged as a death case. That if this evidence is sufficient to support the special circumstance that resulted in Stephen Bennett's life sentence without possibility of parole, it also would have been sufficient to justify putting him to death. And I think that can't be the case, and that isn't the case under the current case law. And for all the reasons that we've discussed today. That's a tricky issue, though. If the issue were whether or not this is sufficient to put someone to death consistent with Tyson under federal law, I think the answer is no. And I think a court of appeal, a state court of appeal, concluding otherwise, would unreasonably be applying Tyson. I'm with you on that. On the other hand, they are applying a state statute patterned after Tyson. And they're applying it in a non-capital case. So I'm not sure the degree to which my conclusion that this is a misapplication of federal law under Tyson with respect to a capital case, how that applies here. Can you help me? The standard, as the California legislature and courts have made it, is that the reckless indifference standard is exactly the same under TSON, where the Eighth Amendment and the death penalty were at issue, and under California's penal code section 190.2d. And it may not make sense that the standard is the same, but the fact remains that it is. And the California Supreme Court has explicitly said, this standard is based upon TSON. We interpret this in line with TSON. And so if this court were to find under TSON that the death penalty would violate the Eighth Amendment on these facts, it should also find, based on the California Supreme Court's statement that TSON governs section 190.2d, that the evidence is insufficient to support the special circumstance finding in this case. Okay. Thank you very much. Thank you, counsel. Thank you. Bennett v. Barnes is submitted.
judges: Wardlaw, Fletcher, Owens